3-17-0299 Susan Steed as Administrator of the Estate of Glenn C. DeCease Accountant by Martin Lucas v. Rezin Orthopedics and Sports Medicine and Dr. Stephen Treacy, Appellee by Stephen Recknell Good morning, and may it please the Court. Good morning, Counsel. My name is Martin Lucas, and I represent the Steed family in this matter. And I'd like to start by talking about how we want to have juries get these things right. In order for juries to get things right, we need to give them the proper parameters to do so, so that they can have a justifiable decision. Whether I agree with it or not, we want it to be justifiable. In this case, unfortunately, the trial judge, I think, completely misunderstood the theories of liability and made several evidentiary rulings that highly prejudiced the plaintiff. And the one ruling related to the standard of care issue wasn't a simple matter of being heard once or even twice by the jury. It streamed throughout the entire case. The issue we're raising before you regarding the whole idea of standard of care was misunderstood by the trial judge because there were really two theories. There were two defendants and two theories. The group practice itself had an institutional theory that was very simple. A doctor gave an order, and those people had a duty and obligation to follow that order, and they didn't do it. It was very simple. It's essentially ordinary negligence, but what they call standard of care or not, there was no dispute that that was their obligation, and they didn't do it. The other theory of negligence was directed to the individual doctor who treated our client, the deceased Glenn Steed, but that was a one-issue matter. It had nothing to do with when Glenn should come back. It had to do with whether or not a certain medication should have been given to treat a DVT. That was the only allegation against Dr. Tracy individually that had anything to do with medical care. So the idea that the defendant can look back in the rear view mirror and try to introduce evidence that, oh, well, we could have ordered Mr. Steed to come back in four weeks instead of two weeks, was completely irrelevant and highly prejudicial to the plaintiff, because whether we talk about standard of care or ordinary negligence doesn't really matter. What matters is what is specifically required for this patient. The standard of care isn't this global idea. We even instruct the jury in like or similar circumstances. It's not the whole world of patients in an orthopedic office. It's a patient with this condition and with this circumstance. If I could summarize what you're saying is the doctor, and patient-specific, created a standard of care that the institution he was employed by did not follow or violate. Is that another way to say what you're trying to say? A better way to say it, yes. It's a very succinct way of saying it. And if I can point out, Your Honor, there was no dispute at trial that that was the case. There was no contradictory evidence that when he wrote that on that super bill, that that was what they were supposed to do. There was no discretion. We also took great pains throughout the trial to make sure it was clear to the court and the jury that when Dr. Tracy wrote that two weeks on the bottom of that super bill, it was not an arbitrary number. It was specific to Glenn Steeve. There were medical reasons for that two-week order. In fact, he used that word, order, multiple times throughout the trial. This, again, was not just pie-in-the-sky number. It didn't apply to every patient. It only applied to Glenn Steeve in this set of circumstances, and it wasn't followed. There was no dispute. There was no expert testimony of dispute that they weren't supposed to follow that instruction. There was nothing there. The trial court, well, again, we believe that throughout the trial, the attorney general shouldn't have heard that information that you could have done four weeks. He had a chance to correct it by granting our motion during jury instructions for a directed finding on the issue of negligence as to resident orthopedics. It was a simple correction, and we could have focused then on the proximate cause of the death, which really wasn't having a dispute. Everybody agreed it was a pulmonary embolism, and everybody agreed that the symptoms that had been described in the trial that he was having from the time he got cast until the time of death were consistent with the development of a DVT, a deep vein thrombosis, and ultimately a pulmonary embolism. So, again, I think I heard a couple of analogies about what the defendant was trying to do by introducing this four-week standard of care, and it's, again, other than a relevance argument, I almost think of it as the plaintiff's version of a post-remedial measure. The defendant would argue, I can't introduce a post-remedial measure to prove negligence because I have to prove that they knew or should have known something, and this is all after the fact. It seems like, on this end, they're trying to create a new standard of care for the global orthopedic patient instead of focusing on what Dr. Tracy actually ordered for this particular patient, which, again, clearly was not followed. Does it matter whether he ordered it for this particular patient? Isn't the concept a little broader than that? When a doctor writes on the super bill or mega bill, whatever they call it, follow-up in two weeks, nobody in the practice can deviate from that directive. Correct. But it's not just unique to one patient. It's a little broader, I think. If the practice is disregarding what a doctor has specified and they can't establish a reason why they did that, in other words, the doctor wrote another script or whatever, then there's negligence. Yes, and, in fact, there was also testimony on that point that if there was an issue that the nurse or the receptionist or whoever was dealing with this could have gone to the doctor and addressed any problem with him, but it was clearly not discretionary that they could, on their own, go beyond that order. And, again, there was no testimony that they did such a thing. And there was no testimony, by the way, that Dr. Tracy, if he had been told, that he would have changed his recommendation or his order, which I think is also important on that particular issue. Oh, I have another question here. Sure. How long from casting until he calls the practice? Six days. He had the cast put on February 19th of 2009, and he called on February 25th. And we do have physical evidence, so to speak, of that phone call, because it was documented that he called in and the appointment was changed. If I can use your question to jump ahead to the hearsay argument, I think no matter which direction you analyze that hearsay question, whether it's not hearsay or it's an exception to hearsay, the judge got it wrong at the trial level. Because let's look at it this way. The phone conversation that Mr. Steed had with the group puts them on notice that he's having a problem. It doesn't matter if it's true what he's asserting. What matters is he's putting that on notice that he's making a statement of physical complaints. Two, it doesn't matter if he doesn't know who he's talking to initially. He calls the doctor's office to make complaints, so he's making those complaints in order to get some type of medical treatment or diagnosis. Whether the receptionist is supposed to answer that question or not really isn't the point for him. He is putting them on notice that I'm having a problem. I need medical treatment or diagnosis. What should I do? So we have that exception. In addition, and I think most importantly, it goes to a non-hearsay argument, which is they were relying on that conversation. Because let's put it in the context that Sue Steed wants her husband to call the doctor because she's concerned about her husband, as most spouses would be about their spouse. And she wants to make sure, one, he's made the call, let them know what's going on, so that she can figure out what he should do next and what she should do next. Now, she can testify to that, can't she? Or can't she not? She can testify to the fact that... Just everything you said. I'm sorry? If she said everything you said, can she testify to that? Yes. Okay. But she wasn't allowed to. Okay. I mean, she was not allowed to talk about the conversation between herself and her husband about his conversation calling in the doctor's office. But everything that I've outlined for you about what that conversation would have been, and we didn't offer proof on this, was, again, either an exception to the here-to-say rule that it goes to medical diagnosis or present physical condition. And most importantly, in my mind anyway, it goes to the reliance on the statement. And by the way, we are also... But there's no question that she can testify to his condition, and she can testify that he made a phone call. Correct. And she can testify that following the phone call, these activities were engaged in by her and her husband. Here's where I think the missing link is, so to speak, for us, is that even though contributory negligence was not an issue in a case like this, from a practice standpoint, we know the jury is going to ask themselves, and Justice, you asked the question, how long after the cast was the phone call made? We know the jury is going to ask that question. He dies on March 8th. That's within the two-week window, though, isn't it? No, that's after the two-week window. The phone call is within the two-week window. And there was evidence, again, that if he called to claim what the cast, he probably should have been brought in and evaluated. But going back to what I was trying to relate to is that the jury wants to know. What are you doing between February 19th and March 8th? What are you doing? If you're having problems, why should we believe you? Well, here's why we should believe you, because not only are you icing your leg and elevating that for that phone call, but you also felt, I don't need to call again because they told me this is all I need to do. The jury didn't adhere to that part of the equation, and I think that's a big link for them. And that ties into the prejudice, ultimately, of this closing argument issue, because what were they really trying to do when they introduced this inaccurate testimony from one of the employees about Glenn being difficult to schedule, which, again, was not testified to in part because they were barred from offering any sort of testimony, but it was brought up in closing. Well, why would you bring that up in closing? Because you're trying to show the jury that if he was so bad, if he was having these symptoms, why wouldn't he have called? Why wouldn't he have done something? Well, we wanted to be able to tell them why he didn't call again. We wanted to be able to tell them why he didn't do something, because the fact is, he did. He called, this is what he told them, and this was their response. And, again, all these things that I'm pointing out to you fall within an exception of the hearsay rule or a hearsay purpose, but it does clarify for the jury what Mr. Steeve and Mrs. Steeve, she's the one that they're seeing in the courtroom, what were they doing during that time frame? And that was the issue the jury needed to hear, because that was the one part that they were missing. Counsel has two minutes. So, all in all, again, I think that the trial judge, you know, put a pressure to solve on you, to directly find the admission of negligence, because there was no dispute about the activities of the group. And at this point, Your Honors, we're asking you to grant, reverse the order of trial court, grant us a new trial, and I would also ask that with a direction that there be a finding of negligence against the group and try to case only on approximate cause and damages. If there are other questions, I thank you for your time. Okay, thank you. Thank you. Thank you, Your Honors. Steven Riefelt. Good morning, Your Honors. Steven Riefelt for the Advocacy and Residential Orthopedics. I wanted to point out one thing in regard to Counsel's comments as to whether the timeliness of the scheduling and the follow-up appointment was or was not relevant. As you've heard, it's the plaintiff's position that once Dr. Tracy set a follow-up appointment for two weeks down the road, that that conclusively determined that residents' standard of care required at the center appointment two weeks down the road. I would point out that in the plaintiff's complaint, they charged the resident with two, well, more than two, but in this case two relevant and separate charges of negligence. One was the failure to follow Dr. Tracy's order, but the other one was a separate charge against the resident that they had failed to timely schedule the follow-up appointment. Those were two separate, distinct charges of negligence. And so the timeliness of the scheduling of the follow-up appointment was certainly relevant. It was relevant under the plaintiff's own allegations. The overall question on the standard of care is, the way we view it, is did the plaintiff's decedent receive care from a resident that comported with the standard of care applicable to community premedical treatment of someone with these injuries? Dr. Tracy's instruction to set a follow-up appointment for two weeks down the road is certainly evidence that it's relevant to setting residents' standard of care. But as I cited in our brief, I cited two Illinois Supreme Court cases on this issue, and they're both related to the standard of care for a hospital or a health care provider. And in both cases, the Supreme Court found that internal rules of the health care provider regarding how to schedule follow-up appointments, etc., whatever the internal rules happened to be, were relevant to the setting of the standard of care, but they weren't determinative of that issue. And the reason they weren't determinative is because it wasn't a private standard of care. It was a standard of care applicable in the community. And in that respect, even when rules had been violated or there's proof that rules have been violated or evidence to that effect, expert testimony is still relevant and admissible to set the standard of care. And that's exactly what happened in this case. Plaintiff had a doctor testify on their behalf, Dr. Jim Rennan, I believe his name was. He testified that in this opinion, the plaintiff's decedent was at high risk for development of a deep vein thrombosis. Thrombosis. And as a result, setting a follow-up appointment for him for two weeks after the date of the initial meeting was what the standard of care required. But there were four doctors who testified for the defendant who disagreed with Dr. Jimmins. All four of them testified in their respective opinions of the plaintiff's decedent was not at high risk for developing a deep vein thrombosis. He was at low risk for that. In addition to that, Dr. Tracy himself testified that the standard of care did not require a follow-up appointment within two weeks. A follow-up appointment within three or four weeks, in Dr. Tracy's opinion, would have met the standard of care. But he said it for two weeks. He asked for the appointment to be set for two weeks, but as he said and as other experts said, that did not set the standard of care. He doesn't have the ability to set the standard of care. That's relevant evidence, but it's not the be-all, end-all. There was other evidence that was admissible and was admitted. And his own testimony was one of those factors. We also had a trained expert who testified that in his opinion, a follow-up appointment was not required until four to six weeks after the date of the decision. In fact, his opinion was that at this particular registry, there was no intermediate follow-up appointment required. The next appointment that would have been required under the standard of care would have been the date, the appointment for the date to take the gas off. So the jury was presented with conflicting and opposing expert opinions regarding the development of standard of care. The point of this theory was it was two weeks, and this theory was it was an order from three to six weeks before the date of the follow-up appointment. There's case law that says when there's competing expert testimony on the issue of the ethical standard of care, that issue should be decided by the jury, not by the court. What is the standard of care, and this may be off-base, probably is, when you are also told by a physician that if you have any swelling, et cetera, et cetera, et cetera, contact us. And he was given instructions, the receipt was given written instructions to that effect on the date of the gas. How does that relate to the standard of care? I mean, what is the standard? I mean, apparently, just from 30,000 feet, he followed those instructions. He contacted. Well, there's evidence he called the clinic, and there's evidence that after that call he changed his, he started treating himself the way he had before the phone call. Right, right. So that evidence is there, but I don't know. Well, I mean, does that bind the institution, the practice at all? I mean, is there any potential negligence there that may not be appropriate? Because of how they responded to the phone call? Correct. Well, the contents of it, we don't really know how they responded to the phone call, at least the jury did not, because the contents of the phone call were not in the evidence. Correct. That's what the phone call was. And obviously, as your Honor is commenting, the actions taken by the client in response to the phone call was also known to the jury, but the contents of the phone call itself, what he said to whoever answered the phone, The jury never got that. The jury never got that, and they should not have. Okay. That was clearly hearsay in my opinion. It was a statement, an out-of-court statement, which was attempted to be submitted for the truth of the matter asserted therein, and it's the classic of the issue of hearsay. I have a question on standard of care. Why isn't the standard of care that applies here that nobody with the practice overrides a doctor's specific order? Why isn't that the standard of care? Well, there's no evidence in the record that anybody with the practice did override the doctor's specific order. Well, there was no appointment scheduled within two weeks, so somebody decided they didn't have to do that. I don't believe that means they overrode the order. Let me talk about the testimony of... So my question is really specific. Is that the proper way to measure the standard of care? No. Why not? Because the question is, in the plaintiff receipts, however, in my view, whether the employees of the clinic did or did not follow the instructions of their superiors, that's not irrelevant, but it's not the standard. The standard is, was the medical treatment provided to the plaintiff, the plaintiff's deceitful, within the standard of care applicable to treatment of those types of injuries? And if it was, the fact that the... I'll talk about the testimony in a minute, but the fact that the receptionist didn't schedule that follow-up for two weeks wouldn't have made any difference. On the other token, if the treatment provided was not in the applicable standard of care, the fact that the receptionist had followed the orders wouldn't have been a disaster. So the question is, what was the medical treatment provided? And did that treatment conform to the standard of care? So the question is, what do the standards of care require as far as follow-up treatment goes? And on that issue, there's conflicting... obviously, conflicting expert opinion. That's going to be the record. Let me talk for a minute about the testimony of... There's two receptionists that we're involved with here. First one, I believe her name is Jody Decker. So she's the receptionist on duty the very first time a patient goes in to see Dr. Tracy. She testified that she had been trained to do this. When a patient presented himself for scheduling multiple appointments, that she was instructed to try to schedule all of them at once if she could. But she also testified that there were a number of times when she couldn't do that for whatever reason. The patient didn't know his schedule, whatever. There were times when the patient couldn't schedule every single follow-up appointment at once. So what she was instructed to do in those cases was to schedule the first appointment and then advise the patient that he could schedule the follow-up appointments either by phone or when he came back for the first follow-up appointment. Now, she was testifying eight years after the fact. So she didn't have any recollection, specific recollection, of interacting with the patient in those cases. She did know that there were two appointments required and she only said one. But that was entirely within what she testified was her custom and practice for situations where she wasn't able to set two at the same time. So she sets the first appointment, which is two days after. So he's in February 17th. She sets in to come back for the cast two days later, February 19th. He's coming back to a different office at the clinic. So on February 19th, when he comes in, Dr. Tracy's not there. He has to cast abroad by another physician. And that second appointment, the second receptionist, her name was, I believe, Victoria Hare, that's when the follow-up, the ultimate follow-up appointment, the one from March 13th, the one that fell outside of the two-week round was set. There's no evidence in the record as to how or why that date was set. We don't know from the record that the plaintiff asked for a date in two weeks. Does it matter? Yes. Because the question is, was Victoria Hare in a date which is not setting that two-week date? Why would a receptionist or a nurse be able to substitute their judgment on the proper schedule, based on convenience to the client? Well, there's no evidence that she knew about the two-week date. We know that the plaintiff's deceitfully knew about it. Well, if she didn't know about it, then why isn't the other physician negative for not docketing or not indicating that there has to be a follow-up within two weeks? Don't doctors read the other doctor's notes? Well, the written note that's involved, the super bill that they referred to in the record, it's more of a billing document than it is a, it's not something that goes in the health file, it goes to the billing department. The physicians in the practice, apparently, you were a physician in the practice, you were completed with the patient, you would turn in the super bill, and that's how the patient got billed. But as a convenience matter, the doctor would typically write on the file what the instruction was. But that super bill didn't wind up going into the health care file, it wound up going to the billing department. And if any of this was only two days later, it wouldn't have showed up anyplace. Counselor has two minutes. I don't know if I answered. I think you did. Let me talk a bit about the last issue that was raised, and that is whether comments by counsel during a closing argument constitute mischaracterization and therefore reversible error. I went into quite a bit of detail in the brief about what the actual testimony of Jody Deckard was. I mentioned a little bit of it here. I don't believe there was a mischaracterization in any of this. But even if there was, there was a contemporaneous objection by plaintiff's counsel at the time and an immediate disruption by the trial court to the jury that argument of counsel is not supported by the evidence of the mischaracterization. In addition to that, the trial court gave a similar disruption to the jury at the end. The case law is very clear that under those circumstances, the trial court judge acted in the way that it did in that case. Any possible harm by the statement made in closing argument was cured by the trial court judge. I think that's all I have. Thank you, Mr. Reiffe. I'll just point out first that pleadings get me into the courthouse. Evidence gets me to the jury. When we got to the trial of this matter, everybody knew what the expert opinions were. They knew what the allegations were specifically that most likely would be allowed into the courtroom in front of the jury. And at the time of trial, Dr. Jimenez offered no criticism of Dr. Tracy related to the scheduling of the patient. His only criticism went to whether or not he should have given him chemo prophylaxis for possible DVT risk. That was the only criticism he had about standard of care for Dr. Tracy. Everything else he talked about was they didn't follow the order. There was no testimony from any expert in this case that said it was appropriate for the staff at Resin Orthopedics to ignore that order. And it doesn't matter if it's a super bill or if it's a typewritten order, they had an obligation to follow that order, and they had no explanation for why they didn't do it. And there's nothing that he heard this morning to explain it. There was nothing at the trial to explain it. And, again, the trial court could have taken the opportunity to correct that problem and enter a direct finding. It could have reversed the jury's verdict on that issue because there was no evidentiary dispute about that order. Now, it's true that internal policies at a hospital or a group can help establish a standard of care but may not be the national standard of care. But that's not the issue here. The issue here is for this particular patient. Why was he given that order? Again, it was not arbitrary. It was in his best medical interest that Dr. Tracy described. It wasn't even Dr. Jimenez who said it was Dr. Tracy. And it wasn't just DVT issues. It was multiple issues why he wanted him back in two weeks. And it's not Glenn Steeve's fault. It's not Sue Steeve's fault that somehow there was a mix-up in the group as to when and how he should have been scheduled. He wanted him back within two weeks from what date? From casting date or his first examination? Because there was a difference. Yeah, that was actually a good question. I think we always assumed, quite honestly, that it was two weeks from the casting date. Because that was part of the reason Dr. Tracy gave for wanting him back in two weeks because he wanted the cast placed in a certain angle that actually would be very uncomfortable. And so the follow-up appointment for the cast was going to be to check the cast in part to see if he could change it so it would be in a more comfortable position. So again, that was part of the best medical interest for the patient. But for the other conditions, the collateral conditions, one of which apparently was the cause of death, the instruction was to contact the clinic, to contact the practice, wasn't it? Right, and that was a jury instruction. It was given that they failed to follow up with the doctor to get him in for evaluation. And that again goes back to that phone call which was made because we were not able to explain to the jury what that phone call was all about. I think the jury would have struggled with that instruction because what was the evidence? There were pieces of that puzzle that were missing because we couldn't get that evidence in. Was there any evidence there of symptomology of DVT development and formation? We did have that, yes. There was testimony from Sue about throughout the time period after the casting that he developed certain symptoms, achiness, discomfort. There was some swelling during the visit. No, that's his condition, but I'm talking in terms of the relationship between making, if you have any, I don't know what the exact alleged description was, to contact if you have some symptoms, or was it generic if you have? It was fairly generic in the words that you're having discomfort, you're having a swelling, you're having a pulse. Okay, and was there any expert to suggest DVTs are indicative, the indication of development or the existence of one manifests itself with these symptoms? Oh, yeah, the defense experts all admitted that the descriptions that were being given about his calf at that time would be potentially indicative of a DVT either there or developing and what should have been evaluated. I mean, obviously there was a dispute. Can you say 100% certain it was a DVT? Of course not, but it promised an evaluation, which again, everybody agreed to. There was no dispute on that. The only dispute in the case really was whether or not chemo prophylaxis should have been given. The jury rejected that. They're not appealing that issue. Let me just circle back quickly to the standard of care issue and counsel's comment about institutions, policies, and procedures and whether or not to develop standard of care. In this case, I guess the question that I would ask the defense would be if that order on that Super Bowl was not the standard of care for this patient at the time, why wouldn't the staff from resin have discretion? If it was not the standard of care for that patient, then you would think that the staff would have discretion to schedule him whenever they felt they could fit him in. But that wasn't the case. The evidence clearly was the opposite of that. They did not have discretion. It was not arbitrary. They would have to go to the doctor to get an exception to that order. So that argument falls on its face because of the own statements from the defendants themselves. So clearly that was what was supposed to happen for this patient, and that's what we're going to talk about is that patient, not some hypothetical patient. It's that patient and what was in his best medical interest. So, again, I really appreciate your time, Justices. And, again, we would ask you to reverse the judgment of the trial court and allow us to leave trial in the appropriate order that the evidence should be directed by. Thank you. All right. Thank you, Mr. Lucas, and thank you both for your arguments today. If you change this matter under advisement, get back to your written disposition. I'll take a short recess for a moment.